

**SIGNED this 04th day of March, 2013.**

*Craig A. Gargotta*

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**
_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 11-11924-CAG |
| | § | |
| CRB PARTNERS, LLC, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

-AND-

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 11-11915-CAG |
| | § | |
| RUSSELL DRIVE, LLC, | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | Jointly Administered Case No. 11-11924 |

**MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF**
**DEBTORS' AMENDED CHAPTER 11 PLAN**

Came on to be considered the above jointly administered case and, in particular, CRB

Partners, LLC's ("CRB") and Russell Drive, LLC's ("Russell Drive") (together "Debtors")

Amended Chapter 11 Plan (ECF No. 314). The Court has jurisdiction over this matter pursuant

to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This matter has

been referred to the Bankruptcy Court under the District Court's Standing Order of Reference. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052. For reasons stated in this Memorandum Opinion, the Court is of the opinion that Debtors' plan should be DENIED.

### FACTUAL AND PROCEDURAL BACKGROUND

CRB filed a voluntary petition for bankruptcy under Chapter 11 (ECF No. 1) on August 1, 2011, in the United States Bankruptcy Court for the Western District of Texas, Austin Division. CRB owns and operates real property in Texas. On the same day, Russell Drive, LLC ("Russell Drive") also filed a Chapter 11 petition for bankruptcy (Case no. 11-11915-CAG, ECF No. 1). Russell Drive owns two separate properties in Travis County, Texas, along with other properties owned with CRB. CRB and Russell Drive filed bankruptcy petitions to halt foreclosure proceedings initiated by First National Bank ("FNB").

On August 2, 2011, CRB and Russell Drive filed a motion for joint administration of cases pursuant to 11 U.S.C. § 1015 and Local Bankruptcy Rule 1015 (ECF No. 2). Russell Drive and CRB are "affiliates" pursuant to 11 U.S.C. §101(2)(B).[1] The single largest creditor of Russell Drive and CRB is FNB. The debt owed to FNB is secured by real estate owned by CRB, as well as real estate owned by Russell Drive. The Court granted the motion for joint administration on August 26, 2011 (ECF No. 12), and the two cases came to be administered under Case No. 11-11924 CAG.

Two properties comprise substantially all of the assets of CRB and Russell Drive. One property, the "Travis County property", consists of an office building on Russell Drive in Austin, Texas, with a small adjacent tract fronting Ben White Boulevard. The other property, the

---

[1] Charles E. Howard is a 50% owner of Russell Drive and a 31.66% owner of CRB. Therefore, Mr. Howard owns, directly or indirectly, the power to vote at least 20% of the voting securities of each entity. This ownership makes CRB and Russell Drive "affiliates" under the bankruptcy code.

"Cameron County property", consists of (1) 43 residential lots; (2) "Cottonwood Creek Subdivision No. 1" on which is located a clubhouse, swimming pool, Jacuzzi, tennis courts, and shuffle board area and; (3) approximately 67.329 acres of land comprised of (i) 23.72 acres of a yet-to-be-developed subdivision consisting of 130 lots; (ii) Development Reserve II of 19.08 acres and; (iii) nine-hole golf course constructed, maintained, and operated on approximately 24.5 acres ("Golf Course").  FNB has liens on both properties.

On February 3, 2011, Debtors filed their Chapter 11 plan (ECF No. 261).  FNB, Cottonwood Creek Property Owners, Inc. ("CCPO"), and the IRS filed objections to the December 30, 2011 disclosure statements (ECF Nos. 263, 264, 143).

Following submission of the plan, Debtors filed a Joint Motion to Value Collateral (ECF No. 262).  The purpose of the Motion was to determine the actual value of the Cameron County Property (the property to be conveyed back to FNB in satisfaction of the debt).  After several continuances, the Court held a hearing on the Motion on June 29, 2012.  The Court determined that the value of the Cameron County Property is $1,340,000.00, including a deduction for ad valorem taxes.[2]

In late July, following the valuation hearing, Debtors filed an Amended Disclosure Statement (ECF No. 313) and an Amended Chapter 11 Plan (ECF No. 314).  The Amended Plan ("the Plan") proposes to pay both CRB and Russell Drive's creditors through a single bank account, the "Liquidating Fund."  Under the Plan, CRB and Russell Drive would contribute its cash on deposit to the Liquidating Fund.  CRB would further contribute the proceeds from the sale of its personal property.  The Plan also notes that equity holders of both Debtors will

---

2 The Court gave an oral ruling of the value on July 6, 2012 and requested that FNB's counsel submit an order reflecting that ruling.  Counsel submitted the order on November 5, 2012.  The order, as well as subsequent filings in the docket, states an incorrect value of $1,360,000.00. This opinion only utilizes the value of $1,340,000.00 as determined by the Court.

contribute additional money into the Liquidating Fund, but does not specify which equity holders will contribute or the amount of their contributions. At the confirmation hearing, CRB equity holder, Don Speers, testified that he would contribute as much as $100,000 to the Liquidating Fund.

The Plan proposes to convey to FNB, in full satisfaction of its claim, a portion of the property securing the debt and states that principal, interest at the non-default rate, and reasonable attorneys' fees owed to FNB exceeding the value of the property will be paid from the Liquidating Fund.[3] It provides that CRB's General Unsecured Creditors (Class VIII) will be paid 10% of their claims, while CCPO and "Homeowners in Cottonwood Creek Owed by CRB" (Class VII) will receive a pro rata distribution of the funds on deposit with the 199th Judicial District Court, unless the court determines by final non-appealable judgment that the funds should be paid to CRB.[4] In that case, the funds will be paid into the Liquidating Fund. FNB and CCPO filed objections to the Plan (ECF No. 477, 478).

On September 14, 2012, the Court approved Debtors' Disclosure Statement (ECF No. 331) and set a confirmation hearing for November 5, 2012. The confirmation hearing on the Plan was then continued to November 28, 2012. Ballot Summaries for both Debtors (ECF Nos. 551, 552) indicate that FNB and CCPO are the only voting creditors to vote against the plan.

FNB's objection to the plan addresses multiple reasons for denying confirmation (ECF No. 477). FNB's primary objection; however, lies in the "dirt-for-debt" nature of FNB's treatment under the plan. FNB asserts that the Cameron County property does not have

---

3 The Plan promises FNB payments to the extent that their claims for principal, interest at the non-default rate, and reasonable attorneys' fees exceed $1,360,000. The $1,360,000 sum represents the value of the Cameron County Property. Per the Court's oral ruling, the correct value of the property is actually $1,340,000.

4 The Plan classifies CCPO and individual homeowners together in class VI. CCPO is now the sole creditor in Class VI, as each of the individual homeowners' claims were withdrawn or disallowed.

sufficient value to allow FNB to recover the full amount of its claim and, therefore, FNB is not receiving the "indubitable equivalent" of its claim as required by 11 U.S.C. §1129(b)(3)(B)(iii).

CCPO's objection to the plan (ECF No. 478) numerous objections to the Plan.  These bases for these objections include allegations that the Plan improperly grants the debtor a discharge in a liquidating case, the plan proposes to improperly release third parties from legal claims, and the plan proposes to grant an injunction without compliance with applicable law.  *See* ECF No. 314, sections 10.5, 10.8, (1)(e), (1)(g), and (1)(h).  At hearing on November 5, 2012, and on record, attorneys for Debtor agreed to remove such language from the plan.  However, an amended plan reflecting the change was never received by the Court.  Assuming these provisions will severed from the plan, some of CCPO's major remaining objections are that (1) the Plan improperly creates separate classes of unsecured claims in order to gerrymander acceptance of the Plan; (2) the Plan is not feasible; (3) the Plan improperly utilizes assessment funds in violation of the Covenants and; (4) the Plan violates the absolute priority rule.

A.    CCPO's Claims in This Bankruptcy Proceeding

CCPO filed proofs of claim against CRB in the amounts of $280,560.00, $4,786.00, and $65,884.32.  CRB filed objections to all proofs of claim (ECF Nos. 334, 335, 472).  Objections to proofs of claim in the amounts of $280,560.00 and $4,786.00 were granted (ECF Nos. 392, 393).  Due to multiple continuances, a hearing has not been held on the $65,884.32 claim.  On March 26, 2012, CCPO filed an adversary proceeding (Case No. 12-01055-CAG) alleging that it owned the common areas of the community, or in the alternative that the common areas were held in trust for CCPO and that FNB did not have a valid lien on the common areas (ECF No. 283).  FNB filed a motion for summary judgment, with CRB joined therein, and the Court held a

hearing on August 30, 2012.  The Court determined that CCPO did not own the common areas, that the common areas were not held in trust for CCPO, and that the lien of FNB was valid.

Additionally, CCPO filed its Motion for Allowance of Administrative Expense Claim in the amount of $1,600.00 on June 11, 2012, asserting that CRB was required to remit $1.00 per property per month to CCPO.  After a hearing on the matter, this Court determined that CCPO is not entitled to collect monthly dues from CRB and is not entitled to an administrative expense claim (ECF No. 562).

On November 4, 2012 CCPO filed its Motion for Temporary Allowance of Claim for Purposes of Voting (ECF No. 553).  In the Motion, CCPO requested that this Court temporarily allow its claim in the amount of $65,844.32 for the purposes of voting on plan confirmation pursuant to Bankruptcy Rule 3018(a). This Court granted CCPO a temporary claim for the purposes of voting in the amount of $1.00.[5]

Further, throughout the proceedings this Court received multiple letters from property owners professing dissatisfaction with CRB's management of the Cottonwood Creek XXI subdivision common areas, unhappiness with increases in assessment fees, and concern that CRB's mismanagement will impact the value of the property in the subdivision.[6]  Many of the property owners initially filed proofs of claim in this proceeding for "wrongful lien filed on home[7]" or for the return of monthly dues.  Debtors subsequently filed objections to those claims, stating that any funds the debtor(s) might be entitled to receive would be paid out of the registry, and would be dependent upon the determination of underlying state court litigation (ECF Nos.

---

5 To this date, this Court has not received an order on this motion from CCPO's counsel despite the fact that an Order Due Letter was sent on November 27, 2012.

6 *See, e.g.,* "Letter: CRB Partners, LLC, A Case Study of Arrogance and Stupidity filed by Creditor Edward Koelper. ECF No. 60.

7 *See infra* "History of Disputes Between CCPO and CRB". CRB filed liens on the properties of Cottonwood Creek residents who withheld monthly dues from CRB in violation of the Covenants.

82-115, 117-123). The Court granted Debtors' objections to roughly 40 proofs of claim (ECF Nos. 173-212). Any other proofs of claim filed by property owners were withdrawn (ECF Nos. 130, 131, 133-137, 139-142, 144-170).

B.      The State Court Litigation and the Plan

Before CRB filed its bankruptcy petition, it was the plaintiff in state court litigation, styled and numbered as *CRB Partners, LLC vs. Stewart Pierce, Vivian Finch, Gene Voorhies, Donald EuDaly, Margaret Fabian,* Cause No. 2009-06-3459-C, in the 197th District Court, Cameron County, Texas (the "State Court Litigation").

On February 16th, 2012, CRB filed its Motion of CRB Partners, LLC for Order Confirming Modification of the Automatic Stay to Allow Continuation of State Court Litigation (ECF No. 273). The Motion would allow the state court to resume the State Court Litigation, which was halted by the automatic stay, because State Court was the appropriate forum to decide the issues brought forth in the State Court Litigation. That same day, this Court granted the Motion for Modification (ECF No. 274), modifying the stay to allow the continuation of the State Court Litigation as well as any proceeding in any appellate court arising out of the State Court Litigation.

C.      History of Disputes Between CRB and CCPO

Although only tangentially relevant to the proceedings in this Court, the State Court Litigation centers on various disagreements between CRB (the owner/operator of an active adult retirement community called Cottonwood Creek XXI) and CCPO. CCPO is an organization allegedly formed with the intent to be the official representative and liaison for the property owners in the Cottonwood Creek XXI community.[8] CCPO alleges that CRB has failed to

---

8 The memorandum opinion from the Court of Appeals Thirteenth District of Texas (which heard an interlocutory appeal from the State Court Litigation decision granting CRB's request for a temporary injunction against CCPO)

comply with the terms of the subdivision's covenants and governing documents.  Specifically, CCPO argues that CRB failed to make various repairs and to maintain adequately certain common areas, that CRB was not properly using annual dues and assessments routinely paid for the benefit of the community, and that the bids CRB obtained to repair items CCPO deemed broken were unreasonably high.  Further, on April 22, 2009, CCPO's Board of Directors requested that residents withhold monthly dues from CRB and, instead, pay assessment dues into a trust account established to escrow funds.  In withholding monthly dues from CRB residents were in violation of the Covenants and were subject to having a lien placed on their property.

CRB ultimately initiated the State Court Litigation seeking a temporary injunction, a temporary restraining order, and a permanent injunction and alleging that CCPO tortiously interfered with contracts pertaining to the creation of the community, that CCPO fabricated allegations and falsely accused CRB, and that CCPO encouraged residents not to pay assessment dues to CRB.[9]  The trial court granted CRB's request for a temporary restraining order, and on September 3, 2009, entered its first supplemental order granting CRB's request for a temporary injunction and requiring that all monies collected by CCPO from residents be returned to CRB. The State Court Litigation is still pending.

## DISCUSSION

A.      Indubitable Equivalence

In order for the Plan to be confirmed, the Plan must meet the requirements of 11 U.S.C. § 1129.  Because FNB has voted against the Plan, 11 U.S.C. § 1129(b) must be satisfied before the

---

notes that there was some argument as to whether CCPO followed the correct procedures to become the registered property owners association for the community.  Further, the memorandum opinion notes that several other owners of the community later formed the "Cottonwood Creek Property Owners Association, Inc." which purports to be the true property owners' association for the community.

9 Notably, one resident letter to this Court paints CCPO as an "illegal board", and describes CCPO as "[having] a personal vendetta against CRB" (ECF No. 67).

Debtor can "cram down" FNB's claim. Section 1129(b)(2)(A)(iii) requires that a creditor receive the full value of its secured claim or the claim's "indubitable equivalent" in order for a plan to be fair and equitable. There is little question that plans proposing to surrender all property to which a lien attaches are "fair and equitable" and the creditor in such cases receives the indubitable equivalent of its secured claim. *See **Sandy Ridge Dev. Corp. v. La. Nat'l Bank***, 881 F.2d 1346, 1350 (5th Cir. 1898). The same cannot always be said with respect to a plan that proposes to surrender only a portion of the collateral in satisfaction of the secured claim—a "partial dirt-for-debt" plan. In such cases, courts must make findings on the value of the real estate to determine whether a partial dirt-for-debt plan meets the indubitable equivalence requirement. ***In re Park Forest Dev. Corp.,*** 197 B.R. 388, 396 (Bankr. N.D.Georgia 1996); ***In re SUD Props., Inc.***, No. 11-03833-8-RDD, 2011 WL 5909648 at *6 (Bankr. E.D. N.C. July, 20 2011). The Debtor has the burden of proof to show the indubitable equivalence of the property to be returned to the creditor. *See **In re B.W. Alpha, Inc.***, 100 B.R. 831 (Bankr. N.D. Tex. 1988). The standard courts apply when analyzing the indubitable equivalence required by Section 1129(b) is preponderance of the evidence. *See **Grogan v. Garner***, 498 U.S. 279 (1991) (stating that the burden of proof required in bankruptcy cases is preponderance of the evidence unless otherwise stated).

FNB asserts that the partial dirt-for-debt plan does not give FNB the indubitable equivalent of its claim as required by Section 1129(b)(2)(A)(iii). As a result, FNB argues that Debtor may not invoke the "cram down" provision of Chapter 11. In support, FNB cites ***In re Arnold Baker Farms***, in which the Ninth Circuit determined that the trial court's valuation of a partial distribution of that land would not provide the creditor with the indubitable equivalence of its claim because there was not a sufficient cushion to protect the creditor even though the

property in question was valued at $52,000 more than the debt.  85 F.3d 1415, 1422 (9ᵗʰ Cir. 1996), *cert. denied,* 117 S.Ct. 68 (1997).  FNB also relies on *In re Prosperity Park, LLC,* No. 10-31399, 2011 WL 1878210 (Bankr. W.D.N.C. May 17, 2011) and *In re Walat Farms, LLC*, 70 B.R. 330 (Bankr. E.D. Mich. 1987) for the proposition that courts have required a significant cushion between the value of the property and the value of the debt in partial dirt-for-debt cases. FNB argues that there is no such cushion here because additional costs that will be incurred with holding, selling, and marketing the property.

In this case, the Plan proposes to return only one of the properties serving as FNB's collateral, in return for full satisfaction of FNB's claim.  The Plan also proposes to pay FNB from the Liquidating Fund "[t]o the extent that the principal, accrued interest (at the non-default contract rate) and reasonable attorneys' fees owed to FNB exceeds" the value of the Cameron County Property (ECF No. 314-1, p- 11).[10]  The Court finds this treatment to be inconsistent with the fair and equitable requirements of Section 1129(b)(2)(A)(iii).

Each "dirt-for-debt" plan must be examined on a case-by-case basis.  As such, a court's determination of the value of real property which forms the nexus of indubitable equivalence also must be made on a case-by-case basis.  *In re Arnold Baker Farms*, 85 F.3d at 1421-22.  In this case, the Court valued the property conservatively.  The court in *In re Simons* articulated the reasons for a conservative valuation process:

> First, the Plan shifts the burden of sale of the [property] from the Debtors to the secured creditor.  By doing so, the Debtors have shifted the risk of loss, as well as the potential for gain, to the secured creditor…the secured claimant will not be earning interest on this portion of the secured claim until such time as the property is sold and converted to cash...[and] valuation is not an exact science, and the chance for error always exists.

---

10 *Supra* note 3, at 4.

113 B.R. 942, 947 (Bankr. W.D. Tex. 1990).   During the valuation hearing, the Court heard testimony and evidence from competent appraisers on behalf of CRB and FNB.   The Court valued each component of the property separately in order to come up with a total value for the Cameron County Property for the purposes of confirming a partial "dirt-for-debt" plan.

The Court was presented with two competing valuations of the property components. The total value according to the Debtor's appraisal is $1,690,000.00. The total value according to FNB's appraisal is $1,450,000.00[11].   Both parties acknowledged the outstanding property taxes owed on the property of approximately $140,000.00.

When presented with two competing appraisals, a court "must determine the value based on the credibility of the appraisers, the logic of their analysis, and the persuasiveness of their subjective reasoning." *In re Park Ave. Partners,* 95 B.R. 605, 610 (Bankr. E.D. Wis. 1988).   In comparing the professional judgment of each appraiser, the Court found the appraisal provided by FNB to be slightly more persuasive.   The Court agreed with FNB's appraiser in determining that a 10% discount for holding costs is appropriate in this case. However, the Court adjusted the value that FNB's appraiser gave to the golf course up by $25,000.   The Court, in accepting FNB's appraisal and adjusting the value of the golf course, found the forty-seven lots to have a value of $260,000, the excess land to have a value of $610,000, and the golf course to have a value of $625,000.   After deducting outstanding ad valorem property taxes owed, the Court set a value of $1,340,000.00 for the Cameron County Property.

---

11 The Debtor's valuation of the excess land is based on 42.88 acres and FNB's valuation of the excess land is based on 46.75 acres.

Assuming, without deciding, that the Court decides to apply the non-default rate of interest instead of the default rate per the terms of CRB's loan with FNB,[12] the value of FNB's claim, as of November 5, 2012, the first day of the confirmation hearing, is approximately $1,339,997.27.[13]  The value of the Cameron County property, as determined by the Court's ruling, is $1,340,000.00.  Based on the Court's valuation, FNB has a "cushion" of $2.73.  Such an amount is not sufficient to "insure the safety of or prevent jeopardy to the principal".  *In re Arnold & Baker Farms*, 85 F.3d at 1422 .  Further, the Liquidating Fund does not have sufficient funds to give FNB enough cash (in addition to the return of the Cameron County Property) to satisfy Section 1129(b)(2)(A)(iii).

In analyzing a "dirt-for-debt" plan, the Court must consider the likelihood that the creditor will actually realize that value and receive payment.  *See In re B.W. Alpha, Inc.*, 100 B.R. 831 (N.D. Tex. 1988); *In re May*, 174 B.R. 832 (Bankr. S.D.Ga. 1994).  In this case, testimony from the Section 506 hearing revealed that it would take FNB approximately one to two years in current market conditions to sell the Cameron County Property and realize the value.  It is true that any determination of the present value of collateral takes into account the time value of money and "compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate'".  *In re Bannerman Holdings, LLC*, No. 10-01053, 2012 WL 4260003 at *7 (E.D. N.C.  October 20,

---

12 There is some question as to whether FNB is entitled to the ordinary contract rate or the contract's default rate. Because the Court finds that Debtor is unable to satisfy the requirements of §1129(b)(2)(A)(iii) at the non-default rate of interest it is unnecessary to reach the issue of whether the default rate applies.

13 This amount includes a principal balance of $1,148,584.71 (*see* FNB's Proof of Claim, Claim No. 100-2); $114,858.45 in interest owed as of October 31, 2012 under the non-default rate (*see* First National Bank's Amended Statement Pursuant to 11 U.S.C. §506(b), and Application for Recovery of Postpetition Fees, Costs, and Interest, ECF No. 555); $1,276.21 in interest owed from November 1, 2012 – November 5, 2012 under the non-default rate of $255.24 per day; $63,052.50 in attorney's fees arising from the bankruptcy through October 31, 2012, *id.*; $4,000.00 in attorney's fees arising from the bankruptcy from November 1, 2012 - November 5, 2012, *id.*; $2,750.80 in other expenses owed to attorneys in connection with the bankruptcy *id.*; and $5,474.60 appraisal fees *id*.

2010) (citing *In re Bryson Props., XVII*, 961 F.2d 496, 500 (4th Cir. 1992), *cert. denied*, 506 U.S. 866 (1992).  It is also true, however, that any plan proposing a cramdown and involving only a partial surrender of collateral, especially real property in a down market, poses challenges and risks in the crucial process of valuation.  *See In re Bannerman Holdings, LLC*, 2012 WL 4260003 at *8.  Further, the bankruptcy court in *In re Walat Farms, Inc.*, stated that if there is any doubt regarding whether the creditor will realize the full value its claim, then the requirements of §1129(b)(2)(A)(iii) are not met. 70 B.R. 330, 334 (1987).

The importance of providing the creditor with a sufficient cushion is justified by the fact that returning only a portion of the collateral shifts the burden of selling the property to the creditor and may increase its risk of exposure.  *See In re Simons*, 113 B.R. 947 (Bankr. W.D. Tex. 1994).  In *May*, the bankruptcy court considered whether the partial surrender of the oversecured creditor's collateral (apartment units) was the indubitable equivalent of the creditor's claim. 147 B.R. at 832.  Although the court found that indubitable equivalence existed in that case, they noted that, in order to satisfy the indubitable equivalence requirements, the return of the collateral not increase the creditor's risk exposure.  *Id.* at 838.  When a creditor only receives a portion of its collateral in exchange for full satisfaction of its claim, there is a risk that the creditor would end up with less than the claim amount.  In such a case, the creditor would have no recourse against the debtor or any of its guarantors.  *See In re Prosperity Park, LLC*, 2011 WL 1878210, at *4.  A finding that the requirements of § 1129(b)(2)(A)(iii) are satisfied in this case with a cushion of only $2.73 would increase FNB's risk of exposure and would not provide FNB with the indubitable equivalent of their claim.

Because FNB will not receive the "indubitable equivalent" of its secured claim, the Court cannot confirm the Plan because FNB is not receiving "fair and equitable" treatment as required by 11 U.S.C. § 1129.

B.    Feasibility

The Court cannot confirm the Plan because Debtors have not shown that it is feasible. Feasibility is an issue of whether confirmation will lead to liquidation or further reorganization. *See **In re Save Our Springs Alliance**,* 632 F.3d 168, 172 (5th Cir. 2011) (citing 11 U.S.C. § 1129(a)(11)). Feasibility is also a question of whether the debtor can actually carry out the proposed plan. ***In re M & S Assoc., Ltd.,*** 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992) (stating that feasibility is a test of "whether the things to be done under the plan can be done as a practical matter under the facts"); ***In re Lakeside Global II, Ltd.,*** 116 B.R. 499, 506 (Bankr S.D. Tex. 1989). One purpose of the feasibility test is to weed out plans that promise more than debtors can deliver. ***Lakeside,*** 116 B.R. at 507. While the proponents of a plan need not establish a certainty of success, they do bear the burden of proving feasibility by a preponderance of the evidence. ***Save Our Springs,*** 632 F.3d at 172. CRB and Russell Drive have not met this burden.

The traditional factors of the feasibility test as stated by the Fifth Circuit are: "(1) the adequacy of the debtor's capital structure; (2) the earning power of a debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operating to enable performance of the provisions of the plan." ***Save Our Springs,*** 632 F.3d at 173 n.6 (citing ***M & S Assoc.,*** 138 B.R. at 849).

The Court cannot confirm the Plan in light of these factors.  Each of these traditional factors relate to a business's long-term health.  Debtors have not convinced the Court that Russell Drive will recover.  Further, they intend to allow CRB to die off all together.  With respect to the six factors promulgated by the Circuit, the evidence presented has shown that (1) Debtors may not have adequate capital to pay their creditors as contemplated by the plan, much less to fuel Russell Drive's recovery; (2)  Debtors' earning power is relatively low; (3)  Debtors have not provided evidence suggesting that economic conditions favor Russell Drive's recovery; (4)  Debtors have not provided evidence regarding Russell Drive's management's competence; (5)  no evidence suggests that management will change;  and (6)  CRB will cease to exist, and Debtors have provided nearly no evidence suggesting that Russell Drive has the fortitude to carry out the plan.

Much of Russell Drive's capital and all of CRB's capital will be liquidated in order to fund the Plan, yet the Plan still contemplates the need for contributions from equity holders.  CRB will cease to generate income for Debtors soon after the effective date.  According to the Debtors' Amended Joint Disclosure Statement for the Amended Joint Plan of Reorganization (ECF No. 313), Russell Drive generates $48,000 of rental income per year and has expenses of approximately $17,075 per year in taxes, insurance, and maintenance.  Debtors have not convinced the Court that Russell Drive's yearly revenue of approximately $30,925 is likely to increase.  At the valuation hearing FNB presented evidence that it would take significant time to sell the Cameron County Property under current economic conditions.  CCPO presented testimony suggesting that CRB, which has management in common with Russell Drive, mismanaged the Cottonwood Creek XXI subdivision.  Homeowners' letters to the Court bolster

this testimony.  Debtors have failed to show that they have the strength and endurance to perform the plan.  The traditional factors do not favor confirmation.

Uncertainty surrounding the Liquidating Fund also renders the plan infeasible.  In this particular plan, Debtors' ability to raise funds quickly is as important to feasibility as their long-term viability.  The Plan requires Debtors to make all of their payments on administrative claims (Class I), priority non-tax claims against CRB (Class II), secured tax claims of the Internal Revenue Service (Class III), First National Bank's claim (Class VI), general unsecured claims against CRB (Class VIII), and general unsecured claims against Russell Drive (Class IX) within 90 or fewer days after the plan's effective date.  The Liquidating Fund is the purported source of these payments, as well as all future cash payments.  The feasibility of these plan provisions, therefore, rests on Debtors' immediate ability to finance the Liquidating Fund, rather than their long-term survival.

The sources of the Liquidating Fund are too uncertain to support the Plan.  Income projections offered to support a plan should be concrete rather than speculative.  *See, e.g., **M & S Assoc.,*** 138 B.R. at 849.  Debtors offer little proof to convince the Court that they will raise sufficient money for the Liquidating Fund.  The Plan depends on capital contributions from equity holders, but it fails to specify the amount or specific source of these contributions.  In *Save Our Springs*, uncertainty surrounding expected donations undermined a plan's feasibility.  632 F.3d at 173-74.  In another case, the plan depended on an unenforceable promise to lend money if certain conditions occurred.  ***In re Made in Detroit***, 299 B.R. 170, 180 (E.D. Mich. 2003).  The speculative and contingent nature of this promise was one of several reasons that the

16

court denied confirmation.[14]  *Id.* at 180.  After a prolonged period of questioning, CRB Equity holder, Don Speers, testified that he will contribute as much as $100,000 to the Liquidating Fund.  Although his testimony was reluctant and confused, Debtors offered convincing evidence of his ability to contribute this sum.  No other equity holders testified to their ability or willingness to contribute.  Debtors' expected equity contributions may be more reliable than those in *Save Our Springs* or *Made in Detroit*, but their projections are still too speculative to convince the Court that the Plan is feasible.  The Liquidating Fund also relies on money from future sales of CRB's personal property.  CCPO claims that some of this property cannot be sold for the benefit of the Liquidating Fund because it was originally purchased using assessment funds or by CCPO and individual homeowners.  Confirmation hearing testimony suggests that the majority of CRB's funds on deposit constitute property assessment funds that cannot be transferred to the Liquidating Fund as contemplated by the Plan.  The Plan's funding is too uncertain to make it feasible.

If these funding sources were reliable, Debtors would still not be able to pay creditors as promised.  In light of developments at the confirmation hearing, the best case scenario appears to be a Liquidating Fund of $171,738.70.[15]  Debtors anticipate $97,855.76 total payments to creditors.  *See* Revised Exhibit A to CRB Exhibit No. 7.  This estimate does not include any monetary sum owed to FNB.  However, the Plan also notes that FNB's claim will be paid through the Liquidating Fund "[t]o the extent that the principal, accrued interest (at the non-default contract rate) and reasonable attorneys' fees owed to FNB exceeds" the value of the

---

14 FNB interprets *Made in Detroit* to hold that plans based on unenforceable promises to contribute funds are never confirmable.  This Court does not fully agree with FNB's interpretation.  However, the Court does agree to the extent that speculative, conditional promises to fund a plan can undermine feasibility.

15 According to Debtors' Revised Exhibit A to CRB Exhibit No. 7, Debtors expect to raise $105,738.70 for the Liquidating Fund.  If Speers contributes the full $100,000, he would add $66,000 to the estimated equity holder contributions of $34,000.  The Liquidating Fund would then total $171,738.70.

Cameron County Property (ECF No. 314, p- 11).[16] It does not contemplate additional payments to ensure that FNB receives sufficient cushion on its claim, which would be necessary to ensure that FNB receives the indubitable equivalent of its claim.[17] $171,738.70 is not enough to cover both the anticipated payments to creditors and the additional amount owed to FNB.[18] Debtors have not shown that the Plan is feasible, and as a result the Court cannot confirm the Plan.

C.    Class Gerrymandering

In its objection, CCPO argues the Plan unreasonably segregates its claim from those of other general unsecured creditors and is designed to gerrymander the classes to ensure at least one impaired class accepts the Plan. *See* 11 U.S.C. § 1129(a)(10) (requiring at least one class of creditors whose rights are impaired under the Plan vote to accept it). The Plan places CCPO and individual Cottonwood Creek homeowners in Class VII. All of the homeowners' claims have been withdrawn or disallowed, leaving CCPO as the sole creditor in Class VII. CCPO claims it should be grouped with the other general unsecured creditors, presumably because the other class of general unsecured creditors (Class VIII) voted to accept the Plan.[19] As an impaired accepting

---

16 *Supra* note 3, at 4.

17 *See* Part A, *supra*, for a discussion regarding CRB's need to provide an equity cushion to FNB to satisfy 11 U.S.C. § 1129(b).

18 The Court has not determined whether the default rate or the non-default rate of interest should apply. However, even under the lower non-default rate, Debtors owe FNB at least $141,812.13 in interest alone as of November 28, 2013. According to First National Bank's Amended Statement Pursuant to 11 U.S.C. §506(b), and Application for Recovery of Postpetition Fees, Costs, and Interest (ECF No. 555), the principal, accrued interest at the non-default rate, and attorneys' fees relating directly to Debtors' bankruptcy proceedings (pending court approval) totaled $1,339,997.27 on the first day of the confirmation hearing, November 5, 2012. An additional $25,677.47 of interest has accrued at the non-default rate since November 5, 2012. Assuming the attorney's fees listed in the disclosure statement are reasonable, Debtors owe FNB $1,365,674.74 in addition to any reasonable attorneys' fees that have accrued since November 5, 2012. The liquidating fund would, therefore, need to cover (1) the money owed to creditors other than FNB, which Debtors estimate to be $97,885.76, (2) $25,674.74 (the difference between $1,365,674.74 and $1,340,000), (3) reasonable attorneys' fees that have accrued since November 5, 2012, and (4) an additional amount sufficient to ensure that FNB receives the indubitable equivalent of its claim. A liquidating fund of $171,738.70 is simply insufficient to fulfill these obligations.

19 When Debtors submitted the Plan, the value and validity of CCPO and the homeowners' claims was not clear. Debtors successfully objected to a number of the homeowners' claims, and the rest were withdrawn. At the

class, Class VIII's vote in favor is sufficient to confirm the Plan. Chapter 11 of the Bankruptcy Code requires debtors to classify creditors' claims. 11 U.S.C. § 1122; ***Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture,*** 995 F.2d 1274, 1277 (5th Cir. 1999). Classes of creditors "will be treated . . . based upon the similarity of its members' priority status and other legal rights against the debtor's assets." ***Greystone***, 995 F.2d at 1277. While debtors have freedom to classify claims against them, the Fifth Circuit has promulgated a clear restriction on debtors' freedom: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id. at* 1279.

In *Greystone*, a creditor ("Phoenix") had a claim that was undersecured, meaning that it had a secured claim up to the value of its collateral, and an unsecured claim for the remaining deficiency. *Id.* at 1277. The debtor's Chapter 11 plan split Phoenix into two classes, one for its secured claim and one for its unsecured claim. *Id.* The debtor did not, however, put Phoenix's unsecured claim in with the class of other unsecured creditors, but rather kept it as a separate class. *Id.* Phoenix objected, claiming that the debtor had "no valid reason" for treating it differently than other unsecured creditors. The court in *Greystone* recognized that this treatment of Phoenix was a strategic move by the debtor's part, meant to segregate Phoenix, a creditor likely to reject the plan, from other unsecured creditors, who would likely accept it as an impaired class. *Id.* at 1278.

When analyzing when it is appropriate to segregate classes, the Fifth Circuit noted that Section 1122 suggests that "ordinarily 'substantially similar claims,' those which share common

---

Confirmation Hearing, the Court held that it would temporarily allow CCPO's claim in the amount of one dollar for the purpose of plan voting. These developments would have rendered CCPO and the homeowner's voting power inconsequential if they were grouped into Class VIII along with CRB's other unsecured creditors. However, Debtors could not have predicted the Court's decisions when they drafted the Plan. The Court must, therefore, entertain the possibility that Debtors segregated CCPO and the homeowners into Class VII with the specific intention of securing Class VIII as an impaired accepting class.

priority and rights against the debtor's estate, should be placed in the same class." *Id.*; *In re Save Our Springs*, 632 F.3d 168, 173 (5th Cir. 2011) (quoting *Greystone*). An exception to this general rule allows debtors to separate small unsecured claims if the court approves such a move "for administrative convenience." *Greystone*, 995 F.2d at 1278-79. Accordingly, the Fifth Circuit stated that classification of substantially similar claims in different classes "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Id.* at 1279. The court considered the following justifications for Phoenix's class structure: (1) legal difference between Phoenix's deficiency claim (which had no recourse in state court) and other unsecured creditors' claims, and (2) "good business reasons." *Id.* The Fifth Circuit held neither justification was sufficient to justify classifying the unsecured claims in separate classes. *Id.* The legal differences between "Code-created unsecured deficiency claims" and other unsecured claims did not alone warrant separate classification. *Id.* While considering business reasons for separating claims, however, the court noted that separating unsecured claims "*might* be valid if the trade creditors were to receive different treatment from Phoenix." *Id.* at 1280 (emphasis added). As an example of different treatment, the court pointed out that the debtor originally planned to create a separate class of creditors which would receive 100 percent payment outside the plan. *Id.* This plan ultimately did not come to fruition, and the court found no further evidence of different treatment or other justification to divide the class, the lower courts' decisions to confirm the plan. *Id.*

The Court cannot see what justification exists, if any, to allow CCPO's claims to be segregated from other general unsecured creditors. Unlike in *Greystone*, the Plan does treat the two classes of unsecured creditors differently. As the Fifth Circuit stated, this *might* lend credence that there is a justifiable reason to segregate the unsecured claims. This fact, however,

is not sufficient to carry the day.  CRB and Russell Drive must provide some evidence as to why they are segregating the classes of unsecured claims.[20]  CRB argued that the contentious history between CCPO and CRB necessitated segregating CCPO's claims in order to allow an easier administration of the estate.  The Court finds this an insufficient ground for segregating the classes.  The Court, having observed the parties' conduct toward one another throughout this case, acknowledges that the history between CCPO and CRB is most certainly "contentious."  Such a history, however, does not provide a reason to treat the homeowners any differently from other general unsecured creditors.  If anything, the history between CCPO and CRB supports CCPO's theory that CRB classified CCPO for the specific purpose of gerrymandering an impaired accepting class.  The strained relationship and difference of opinion on how to proceed through bankruptcy increases the likelihood of CCPO objecting to almost any plan presented by CRB, increasing the incentive for CRB to classify CCPO separately from the other unsecured creditors in this case.

The Court concludes that CRB did not provide a justification for its breakdown of Classes VII and VIII, which classifies similarly situated claimants, with similar legal rights, into separate classes.[21]  Following the holdings of *Greystone* and *Save Our Springs*, the Court cannot confirm the Plan.

D.     Absolute Priority Rule

In its objection, CCPO argues that the Plan violates the Absolute Priority Rule.  The Court finds that CRB's equity holders' continued equity interest does not violate the Absolute Priority Rule.

---

20 The Court notes that neither CRB nor Russell Drive filed any response to CCPO's objections to the plan, and therefore relies only on the arguments presented at the confirmation hearing.

21 The Court will not reach the issues of class discrimination and artificial impairment, having found that the Plan's class structure is invalid because it constitutes class gerrymandering.

The Absolute Priority Rule functions as an alternative for plan proponents to meeting the requirements of 11 U.S.C. § 1129(b)(2)(B)(i); whereby, the plan proponent may demonstrate that no holder of a claim or interest junior to that of the objecting creditor will receive or retain any property under the plan. Under the Absolute Priority Rule, no class may participate in a bankruptcy distribution unless all classes with superior priority are paid in full. *See In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir. 1993) *cert. granted*, 510 U.S. 1039 (1994); *In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604 (Bankr. W.D. Tex. 1990). A plan that does not meet the requirements of 11 U.S.C. §1129(b)(2)(B)(i), or satisfy the requirements of the Absolute Priority Rule, cannot be confirmed. Debtors' Plan does not propose to pay CRB's unsecured creditors the full value of their claims per 11 U.S.C. §1129(b)(2)(B)(i), so it must satisfy the Absolute Priority Rule per 11 U.S.C. § 1129(b)(2)(B)(ii).

CCPO argues that the Plan violates the Absolute Priority Rule by allowing CRB's equity holders to retain their interests when CRB's unsecured creditors are not paid in full on their claims.[22] The Plan provides that CRB and Russell Drive's equity interest holders will retain their equity interests.[23] CCPO asserts that The Absolute Priority Rule applies in this case because the Plan affords general unsecured creditors of CRB (Class VIII) only 10% of their claims and CCPO (Class VII) only 3% of its claim at most, while CRB equity holders retain their interests

---

22 While CCPO's Objection to Amended Plan of Reorganization contains a general objection that the Plan violates the Absolute Priority Rule (ECF No. 478), CCPO's arguments at the confirmation hearing focused only on the Plan's treatment of CRB's unsecured creditors in relation to its treatment of CRB's equity interest holders. Debtors argued that the Plan does not violate the absolute priority rule through its treatment of Russell Drive's unsecured creditors and equity holders because the Plan proposes to pay Russell Drive's unsecured creditors in full. No party argued that the Plan violates the Absolute Priority Rule through its treatment of Russell Drive's equity holders in relation to its treatment of CRB's unsecured creditors.

23 The Plan provides that equity interest holders "shall not receive any distributions or any other property on account of such Interests until all senior classes of claims owed by CRB are paid in full." (ECF No. 314, p-12-13). However, the Plan also specifically proposes to pay CRB's general unsecured creditors 10% on their claims and to pay CCPO an amount that will be determined by a separate State Court litigation. The Court, therefore, interprets the Plan to allow CRB equity holders to maintain their interest if and when CRB's general unsecured creditors receive 10% of their claims and CCPO receives the amount determined by the State Court litigation.

The Court finds that the Absolute Priority Rule does not apply in the context of CRB's equity holders' interests. The Plan and hearing testimony show that CRB does not intend to continue operations or retain any property. The Plan is, essentially, a liquidating plan as to CRB. This Court determined in *In re Introgen Therapeutics, Inc.,* 429 B.R. 570 (Bankr. W.D. Tex. 2010), that the Absolute Priority Rule is inapplicable when there is nothing left to be retained by the equity holders. It is well settled that that control over a company will be considered a property interest for purposes of determining if there is a violation of the absolute priority rule. *See, e.g., Norwest Bank Worthington v. Ahlers*, 483 U.S. 197, 207-08 (1988); *In re Perdido Motel Group, Inc.*, 101 B.R. 289, 291-92 (Bankr. N.D. Ala. 1989). *In re Introgen Therapeutics, Inc.*, by contrast, makes clear that, "The right to receive something imaginary is not property." 429 B.R. 570 at 585. In *In re Introgen Therapeutics, Inc.*, creditors objected to a Chapter 11 plan that gave equity holders the right to have a representative on the board of a liquidating trust, whose only function was to approve or disapprove material transactions proposed by the liquidating trustee. This Court determined that the right was, "far removed from the type of retained control over debtor that could be considered 'property interest' and cause the plan to violate the absolute priority rule." *Id. at 571*. In this case, due to the fact that CRB will be liquidated under the Plan, the "property interest is not just valueless…it simply does not exist." *Id. at 585*. At the confirmation hearing CCPO acknowledged that the CRB equity holders are essentially retaining an equity interest in a "defunct organization". The Court finds that this interest does not trigger the Absolute Priority Rule.

The Plan's treatment of CRB's creditors and equity interest holders does not violate the Absolute Priority Rule.

E.     CCPO Objection to Assessment and Sale Provision

CCPO contends that the Plan proposes to use assessment funds, property purchased with assessment funds, and property purchased by CCPO and/or individual homeowners to pay creditors.  CCPO further argues that this would violate the CCPO covenants.  This is objection does not constitute grounds to deny the plan.

Debtors propose to fund the Plan with proceeds from the sale of CRB's tangible personal property, Russell Drive and CRB's cash on deposit, net funds recovered through litigation, and contributions from equity interest owners.  The Plan does not clearly identify the original source of CRB's cash on deposit.  However, Debtors' Revised Exhibit A to the Plan and developments at the confirmation hearing suggest that CRB will specifically refrain from using cash on deposit that constitute assessment funds.  CCPO's president testified to his fear that Debtors will use assessment funds, property purchased with assessment funds, and property purchased by CCPO and/or individual homeowners to fund the Plan.  Debtors presented testimony to the contrary.  If Debtors do violate the covenants, their actions could form the grounds for a separate lawsuit.  If the Plan required Debtors to violate the covenants, or if it appeared to the Court that Debtors intend to violate the covenants, the Plan could be unconfirmable under 11 USC § 1129(a)(3).  While plan proponents bear the burden of proving that the Plan meets all requirements of 11 USC § 1129, CCPO has not provided any convincing evidence that Debtors plan to commandeer assessment funds or the fruits thereof.  The Court will not deny confirmation based solely on the fear that Debtors might violate the covenants while implementing the Plan.

F.     Substantive Consolidation

The Plan is drafted as though CRB and Russell Drive's bankruptcies have been substantively consolidated.   While the Court granted Debtors' Joint Motion for Joint

Administration of Cases Pursuant to Bankruptcy Rule 1015 and Local Bankruptcy Rule 1015 (see ECF. No. 12), it never contemplated substantive consolidation. The Court is, therefore, unable to confirm any Plan that is written as though the bankruptcies are substantively consolidated.

Substantive consolidation is significantly more dramatic than joint administration. While "[a]dministrative consolidation is merely procedural device," substantive consolidation impacts the parties' substantive rights. *In re Babcock & Wilcox Co.*, 250 F.3d 955, 958 n.6 (5th Cir. 2001). It "occurs when the assets and liabilities of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity." *In re Introgen Therapeutics, Inc.*, 429 B.R. at 581 (quoting *Babcock*, 250 F.3d at 959 (quoting 1 William L. Norton Jr., Norton Bankruptcy Law and Practice § 20:3 (2d ed.2000)). *See also In re Hemingway Transp.*, 954 F.2d 1, 11-12 (1st Cir. 1992) ("substantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate to which all holders of allowed claims are required to look for distribution.")

Per the Plan, Debtors will establish a single, joint bank account from which to pay creditors (the Liquidating Fund). Debtors will fund this bank account with Russell drive's funds on deposit, CRB's funds on deposit, proceeds from the sale of CRB's personal property, proceeds from litigation, and capital contributions from CRB and Russell Drive equity interest owners. The Plan, therefore, treats the bankruptcies as substantively consolidated cases.

Substantive consolidation is a power of the court, not a prerogative of the debtor. *See Introgen Therapeutics*, 429 B.R. at 581-82 (noting that a *court's* discretion to grant substantive consolidation is rooted in Section 105(a) and that the party proposing consolidation bears the burden of proving its appropriateness). Courts are, rightly, reluctant to use this power. *In re*

*Pacific Lumber Co.*, 584 F.3d 229, 249 (5th Cir. 2009) (describing substantive consolidation as an "extreme and unusual remedy") (quoting *In re Gandy*, 299 F.3d 498, 499 (5th Cir. 2002)). Nothing in Rule 1015 automatically permits two separate debtors with jointly administered cases to mingle their assets and obligations.  *See In re Fernandes*, 346 B.R. 521, 522 (Bankr. D.Nev. 2006) ("Section 302 does not automatically consolidate estates…an order of joint administration under Section 302 and Bankruptcy Rule 1015 does not mingle or mix the assets or claims of each estate with each other") (citing *Devers v. Bank of Sheridan*, 759 F.2d 751, 753 n. 1 (9th Cir. 1985); *Ageton v. Cervenka*, 14 B.R. 833, 835 (9th Cir. BAP 1981); *In re Estrada*, 224 B.R. 132, 135 (Bankr. S.D.Cal. 1998)).   It is therefore inappropriate for debtors who have not secured substantive consolidation form a court to draft their plan as though they had.

The Court finds that the Plan treats CRB and Russell Drive's bankruptcies as substantively consolidated bankruptcies.  Because the Court has never substantively consolidated these cases, it cannot confirm the Plan.

### CONCLUSION

Considering the entirety of Debtors' Amended Chapter 11 Plan, as well as all of the objections thereto, the Court is of the opinion that it cannot confirm the Plan.

IT IS THEREFORE ORDERED that CRB's and Russell Drive's Amended Chapter 11 Plan is hereby DENIED.

#   #   #